Good morning, Your Honors. I'm Tom Watson for the Appellants, Plaintiffs Equitable and Paul Revere. The main point I want to make in that argument is that this is a disability case. And I think that's something that perhaps the District Court lost sight of. The main issue in this litigation was whether Rex DeGeorge was totally disabled during the decade of the 1990s from engaging in his regular occupation. Evidence of how DeGeorge actually occupied his time during that decade was critical to the jury's determination of whether he was actually disabled. But that's the evidence that the District Court kept from the jury. The District Court applied the wrong legal standard to erroneously bar plaintiffs from introducing evidence of DeGeorge's conduct during the 1990s based on some... Are you saying that the fact that he arguably engaged in nonstop fraud shows that he wasn't disabled? Well, it's not just that he engaged in nonstop fraud, but just the sophistication of the fraud he engaged in. What he was actually capable of doing, how he chose to spend his time. And this also explains why his law practice was not... I have a little logical leap to me. Well, the reason why the plaintiffs determined that he was not disabled is because, number one, from practicing law... First of all, he was practicing law. He was appearing in many cases during the 1990s at the same time he said, I'm incapable of practicing law.  That's right. But what also... They obviously didn't agree. That came in. And on the other side, DeGeorge said, but I wasn't doing it full time. And that's why I was totally disabled. Well, the reason he wasn't doing it full time was kept from the jury, because he was otherwise occupied engaging in sophisticated, complex transactions involving insurance companies. Don't you think that all of these other activities showed that he was nutty as a fruitcake? I think they showed that he was criminally disposed, and this is all... It certainly was evidence that was relevant to the issue that the jury was trying to determine. It was highly relevant and central to the issue of whether or not he was totally disabled. What you seem to be wanting to adduce was the fact of his continuous fraudulent activities and that he couldn't be trusted to tell the truth on any issue, even his disability. Isn't that... Well, it's not simply... That's the way I read the record. Okay. Your Honor, it's not simply for impeachment purposes. It's for the issue of whether or not he's totally disabled. And also for the issue of what was his regular occupation. Those are two very central issues in a disability case. Now, would you have given him disability insurance if his regular activity was fraud? Well, I'm not an underwriter, but I kind of doubt that they would. Yeah. But at the same time, it is a question of fact for the jury to determine how someone elects to spend their time, what is their regular occupation. And here the district court took that issue away from the jury and said that as a matter of law he was an attorney and whether or not he was able to practice continually was the only issue for the jury to decide. Well, the district court certainly had trouble sorting out and extracting the theory that the plaintiffs were advancing the original. I think it's the initial statement during the pretrial conference where this was raised. He asked your co-counsel, I guess, because it's Mr. Williams who's referred to, I want you to focus on these bad acts. And Mr. Williams suggested, at least with respect to the sinking of the yacht, filing an insurance claim and so on, that it was offered to show that Mr. DeGeorge is a fraud, but it's not offered to show that he's a fraud, but it's offered as part of showing a common plan or scheme to defraud. Now, what was the – and from there the discussion ranged, apparently, for quite some time with the district judge trying to pin down what it was, what the theory was. Now, you say the district court applied the wrong standard, but that's a 403 standard, as I understand it, that you're focused on. Yet most of the discussion, as I read the transcript, seems to focus on whether it comes in under 404B in the first place. What's the relevance? Occasionally, a couple of times, the district court refers to more prejudicial than probative, but I didn't come across to me as that was the focus of the discussion. There seemed to be a real wrestling match with some fairly critical statements by the court about your opponent, but the focus was on whether it came in as relevant in the first place, and that's sort of what we're trying to sort out even here today, it sounds like. And that was my prior point that I was making. It was highly relevant to understand what he was doing. It was also relevant under 404B, the fact that he had stacked 29 disability policies. That's from this court's own opinion in Cigna. He stacked up disability policy after disability policy. All he needed was a disability claim to be in the money. That's highly relevant to his motive for faking a total disability. I think that's on its face clearly relevant. Take that one. Where in the record does that argument get made clearly, and where does the judge say cleanly, without objection, that it's excludable under the improper standard that you're urging? Well, it's. What do you cite to it? Where is it? That's a nice, succinct statement that you've made, but the question I've got is where does it appear in the record? Well, page 31 of the report is transcript. The court states that the prior insurance fraud and claims is excluded under. Yeah, but you see, I think you've just said two different things. Unless I misheard you in response to Judge Fisher's discussion, you're making a he just had a bazillion insurance policies point. Now, as contrasted with the point which I understood you were making at trial, which is that he made arguably fraudulent claims on 29 policies. Very different purposes, it seems to me. And so did you, in fact, argue relevance based upon stacking? This all came up in the motions in limine that DeGeorge filed. He filed four motions in limine, one dealing with the Cigna decision, and the Cigna decision and the Cigna litigation actually talked about the disability policies. It talked about obviously the yacht scuttling insurance fraud and the jewelry and luggage and paintings and everything else that he loses every time he turns around. And they also talked about the motion in limine regarding the criminal prosecution motion in limine. Yeah, but. All of these were argued together. Yes, but so far they all add up to the fact that he made a whole lot of claims that were probably fraudulent. Yes. But that's a different point from asserting relevance based on the fact that he had bought himself a whole lot of disability policies and that somehow the jury should be able to infer from the simple acquisition of a whole lot of disability policies that he was doing it for some malign reason. We opposed each of the motions in limine separately. I'm sorry? Go ahead, excuse me. We opposed each of the motions in limine separately and argued that this evidence was a key factor, first of all, supporting the testimony of our expert, Dr. Evans, that Rex DeGeorge was not totally disabled. And that also was admissible to prove his principal occupation and that substantiated the testimony of Gabriel Falco. In addition to showing that Rex DeGeorge had an intent, a common plan scheme, to defraud plaintiffs. Now, those were all themes that were presented in our opposition to our motion in limine. They're all argued together, and that's when the court said, you know what, it's just more prejudicial than probative. And he applied the incorrect legal standards of the suit. He didn't just say that. That's what I'm a little troubled by. He did not just say that. I spent time reading the whole transcript, and I kept looking for that. He does say that, but he says a whole lot of other things. He says, focus, tell me what the purpose of these bad acts, what do you want to prove by it, what is relevant? And it wanders all over. I agree, maybe you were confronted with a bunch of in limine motions and it all got jumbled together. But the district court that we're reviewing, you're saying we should find abused his discretion because he applied the wrong standard. And yet most of the discussion that I'm able to focus on and find in the transcript is very carefully trying to get plaintiffs' counsel to focus on what is the relevance in the first instance, which you get to before, that's the predicate, before you get to Rule 403. If you're going to put in prior bad acts, prior course of conduct to show intent or whatever, that's an exception under 404B. And then if it falls within it, then the court moves to, all right, you've established some relevance. Let's decide whether if it's relevant, it's substantially more prejudicial than it is probative. Now, he doesn't say substantially, so we can get into that part of the analysis. But I'm still trying to find out where did the plaintiffs' counsel cleanly offer up to the district court who seem quite focused on and quite confused by plaintiffs' explanation as to why these various items ought to come in. Where is it? You cite transcript 31. I'm looking at 30 to 31, and it doesn't. That's the court's final ruling. The oppositions to the motion in limine do, the papers that were actually filed, do explain the rationale more clearly. And that's in the excerpts of the record. Maybe taking it on your own terms, why is it that the claims history in this case is relevant? You started out by telling us this is a disability case. Right. That's what I want to get back to. It's highly relevant. You know, this is not a, a lot of this evidence is not a prior bad act. It is evidence of whether or not Rex DeGeorge was disabled. That was the issue before the court. You mean the fact that he made 29 claims that are, that are arguably fraudulent shows that he's not disabled? No. I'm saying that the, I'm sorry. Let me, again, they're getting jumbled up. The, the sophisticated insurance fraud scheme, forming corporations, buying a yacht, flying around the world, sinking the yacht, that shows the sophistication. The fact that he was then defending, you know, practicing law and flying around the world, taking depositions, that shows the level of sophistication. But the jury, they were, they were given like the face page and a signature page of pleadings. They were not given the details of the level of sophistication of DeGeorge's fraud or his practice. What difference does it make if the conduct was fraudulent? If you want to show activity, why do you have to show it's fraudulent? Why do you have to show he sank a yacht? Why do you have to show he stole paintings or misrepresented paintings? How does that relate? We just have to show what he did. Okay. But it doesn't have to be labeled. No. But we, the jury could certainly make up its own mind, but we had to be able to show him the details of what he was doing. Taking depositions, flying around the world. Okay. Sinking the yacht. And that evidence didn't come in. Not the details. Not all the written papers. Why? What difference? Because the jury has to be able to look at the details of what he did. Otherwise, it's just glossed over. And they're left with a very skewed portrait of Rex DeGeorge, who is practicing law periodically. The rest of the time, they figure he must just be shuffling around his living room. But for disability purposes, if a lawyer were continually taking depositions, talking to clients or to himself, because he was his own client in a lot of respects, traveling around, making court appearances, filing pleadings, filing lawsuits and whatever, what difference would it make whether he did that and committed malpractice for purposes of disability? The point is he was active. It doesn't matter whether he was good or bad or indifferent. Isn't that true? But, again, we have to be able to show the jury what he was doing. Whether you label it good, bad, or malpractice. Why couldn't you show he was flying around the world, taking depositions, filing pleadings, and doing the kinds of things that lawyers do? Because the district court ordered us not to present that evidence. What the district court did was say that his claims history was not relevant. That's what the district court did. The way I read the record, Your Honor, is that the district court said the details of the entire fraud scheme cannot come in before the jury. Yes. In the details. Without labeling it fraud, the details is what we were trying to show, to show exactly how Mr. DeGiorgio. What details? Give us an example of what detail you couldn't go into that would have been material. The details of forming the corporations to escalate the value of the yacht. Forming the corporation. That's work. Whatever the motive of the end result, let's suppose it were some other client that was non-fraudulent. The fact is he formed corporations. Were you able to get that in? Yes. Were you able to get in the fact that he actually took a number of depositions? Yes. Okay. But not the details. All right. Well, what difference does the detail make? To be able to see how agile his mind was, how he could come up with questions, how he could respond to an answer from a witness while he's being deposed, to show the mental acuity that's necessary to take a deposition. That was the issue before the jury. That's what was kept from him. And flying around the world, did you get his trips in? I don't recall whether or not the detail that some of these depositions took place in Italy and other places was coming. I don't recall. Okay. I only have a few minutes left, so let me reserve that time and let me look at the questions. Mr. Morris. May it please the Court. I'm Peter Morris, and I represented Rex the George at trial and represent him here. Your Honors, this was a striking professional disability case. What was striking about it was that every physician who evaluated Mr. DeGeorge came to the same conclusion, that Mr. DeGeorge was totally disabled because of bipolar disorder and organic brain syndrome. What do we do with the problem that the district court excluded evidence of three of the initial treating physicians whose credibility, had they testified, the district court clearly would have allowed them to be impeached, that the later physicians actually relied on that? Did these later physicians actually examine DeGeorge? The later physicians did examine Mr. DeGeorge. With respect to the physicians, and that would be Hefner and Frederick, the two main attacks, very brief reference was made to any evaluations or any statements by Drs. Frederick and Hefner. As a matter of fact, I had no plan to bring up Drs. Hefner and Frederick. The insurance company initially brought up them. Well, I suppose you wouldn't want to, and they would, because if they thought they were being fraudulent and essentially untrustworthy, I wouldn't in your position want to bring them in either. Sure, and if in fact, if they were the key physicians, if they were Drs. Asarnow and Marmer, I would have been in trouble at trial. Fortunately, they weren't. Drs. Asarnow and Marmer had sterling records. But Marmer relied on Hefner's analysis. Well, no, not really. There were 14 physicians who evaluated Mr. DeGeorge. Gershon Hefner very early at the beginning, and in fact, Drs. Hefner and Frederick, the main point of what they did was just fill out attending physician statements, which are the statements that go in monthly to the insurance companies. Their evaluations were not the critical evaluations. What's so important about Drs. Asarnow and Marmer's testimony is they mainly relied on the insurance companies' physicians, because the first important examinations, the so-called IMEs, were done by especially Victoria Thomas and Botello, Drs. Botello, Dr. Ward, and Dr. Ling. They did the initial analysis with respect to Mr. DeGeorge, and they all found him to be totally disabled. Then Drs. Asarnow and Marmer came in, and if you look at their reports, their reports only mention Drs. Hefner and Frederick with respect to the initial listing of every document that existed. I don't think there's any discussion of an evaluation that Dr. Hefner did or that Dr. Frederick did. So, Your Honor, the key point on this is there was an overwhelming amount of medical testimony. It all went one way, that Mr. DeGeorge was totally disabled. It would have been a mistake for the Court to highlight the fact that two of these doctors, very early on, had filled out attending physician statements, who had only filled out attending physician statements. It would have been a mistake to taint the entire medical testimony by allowing testimony that two of the, or evidence that two of the early doctors had problems with the medical board. So, the overall answer is Drs. Hefner and Frederick, their evidence that was mentioned with respect to those two was so insignificant that the Court did the right thing. And second, clearly it would not rise to the level of prejudicial error because their opinions or statements were not important in this case. And they, since every doctor came out the same way, that Mr. DeGeorge was totally disabled, it couldn't, it wouldn't have even had an impact if the jury was told that. Ms. Morris, I'm just a little concerned about the district courts taking judicial notice of DeGeorge's being under the regular care of a physician. He could, I suppose, without any question, take judicial notice that medical care was available. But on what basis did he take judicial notice of the fact that he was under regular medical care? Your Honor, this was an issue that, along with some of the other issues, that was wholly created on appeal and did not exist at the trial. Here was the situation with respect to Mr. DeGeorge being under care, treatment of the care of a physician. We put on evidence that from the beginning to near the end. Well, this just has to do with his, the time during which, as I think the magistrate said, he was a guest at Metropolitan Detention Center. Yes. My point is, at no time during the trial did the insurance company lawyers challenge the fact that Mr. DeGeorge received care. In other words, with respect to the receipt of care, treatment by a physician, we put on a great deal of evidence about the treatment that Mr. DeGeorge received. The reason was, our whole case was a medical case. So we put on evidence of Mr. DeGeorge's care. The insurance company lawyers never raised the issue of Mr. DeGeorge not receiving care. Until after all of the evidence was in, they made some mention of it, the court said, look, given the medical testimony here, I don't see any reason why you should be able to bring up to the jury that Mr. DeGeorge was in prison at that time. I know that treatment is there. And, in fact, the insurance company's lawyers conceded the point. So, you know, this is now made into a major issue on appeal. At trial, it wasn't even raised. So the answer is, Mr. DeGeorge had care throughout the time that he was claiming disability. I know for a fact that Mr. DeGeorge did have extensive care while he was in prison at MDC. The reality is, the insurance companies never challenged it. So we put on evidence. They didn't put on any evidence to rebut it. And so there wasn't a need for us then to show that Mr. DeGeorge received care. However, if they had raised the issue at trial and the court felt that there was a need to put on that evidence, in fact, we would have put on that evidence. So to now, you know, cherry pick, you know, a two-week trial and say, well, you didn't put on that evidence, it didn't become an issue. The court at the end judicially noticed it or made the statement that, yeah, I know that inmates received care because that's a fact that he knew. So I guess the last point I'll make on that, Your Honor, is even if it should have been brought out and so that the court erred, it would not be prejudicial error because we put on mounds and mounds of evidence of treatment received by Mr. DeGeorge. There was some kind of an exchange between the court and the insurance company counsel about this statement. But I don't think they objected and asked that it be withdrawn. Did they? Which statement? The statement that he had continuous care by the judge. No, yes. The answer is they did not object. As I said, I think specifically on the record, counsel, and I think it was Mr. Williams, explicitly conceded and said, Your Honor, we're not challenging that issue. So as I said, I think it was conceded. Now, when I started out, I said that the medical evidence was overwhelming. And I've done several professional disability cases and I've yet to have one where it's so undisputed that even the insurance company's physicians find the insured to be totally disabled. So here's the situation that the insurance company lawyers were in. They had medical evidence going all one way. In other words, on that issue, it was a slaughter. They had no chance. So what they tried to do was take it away from being a disability case. Mr. Watson said, I want Your Honors to, the court lost, you know, focus on that this was a disability case. No. The court stayed focused on that this is a disability case. And the court didn't let the insurance companies do what was their only hope. Which was to try to taint Mr. DeGeorge so badly that the jury would ignore the evidence, the medical evidence, which was the critical evidence, and say, you know what, this guy is so dirty that I don't care that he was totally disabled. We're not going to give him money. And, you know, truly, Judge Johnson was righteous in handling this case. Because he didn't give in to what, I mean, first of all, Mr. DeGeorge had a conviction for, which was fully disclosed to the jury. So Mr. DeGeorge, in part, was dirty. But Judge Johnson didn't give in to say, you know, this person doesn't deserve to have a fair trial on his total disability. I'm going to let it all in. Now, Your Honors are exactly right that the focus, with respect to the claims, was 404B. In other words, Mr. Watson has made a creative but new argument about, oh, we wanted to show the history of claims to show the time that Mr. DeGeorge was spending. That's his main argument now. Mr. Watson's main argument now. That was not raised. That wasn't the argument. That wasn't what the insurance companies came in to do. They wanted to show that Mr. DeGeorge was a big fraud, and every one of his claims were fraud, and therefore, this claim was fraud. That was all what, that's exactly what they focused on. I knew that they were going to do that, so I made the motion in limine to keep out those claims under 404B. The judge's focus was on 404B. So the point, Mr. Watson's argument that no, this really, the issue was the amount of time he spent making these claims, that was not part of the trial. That wasn't part of the record. So the court focused on the 404B, and I think exactly right, said, well, you can't get into these claims under 404B because there's no evidence that the claims were fraudulent. And literally, there was not a single shred of evidence that any of those claims were fraudulent. Yes, there were a tremendous amount of claims. Maybe they were fraudulent, but there was no evidence that they were fraudulent, so there was no reason for them to come in under 404B as prior bad acts. With respect to this issue of how Mr. DeGeorge occupied his time, the insurance companies didn't have any evidence about how long it took Mr. DeGeorge to make those claims. There wasn't a single shred of evidence offered saying, well, it would have taken Mr. DeGeorge this amount of time, and therefore, that was taking up a lot of time, and therefore, he didn't have enough time as a lawyer, and that's the reason he wasn't practicing as a lawyer. That wasn't the argument, again, so they didn't have any evidence to support it. So it's improper for counsel to bring it up at this point. Now, everything Your Honors asked about, though, other than the claims, was put before the jury. What was fair to bring before the jury with respect to the amount of time that Mr. DeGeorge spent was the amount of time as an attorney. In other words, the issue was, was Mr. DeGeorge totally disabled from being an attorney? Was he unable to perform the substantial and material duties of his occupation in the usual and customary way with reasonable certainty? That was the issue for the jury. So it was quite appropriate for the insurance companies to put on the evidence about what Mr. DeGeorge did as a lawyer, and the court let the insurance companies put in all of that evidence. The reality is, as the trial record shows, it turned out to be a very small amount of the time. It clearly was not Mr. DeGeorge's usual and customary way, and it wasn't with reasonable continuity. So, you know, the jury had no reason and didn't find that Mr. DeGeorge was not totally disabled based on the fact that he was spending his time as an attorney because it was a very small amount of time. With respect to the issue of Mr. DeGeorge's credibility, it was very sufficiently attacked at trial. First of all, the recent, I think within a year, conviction for mail fraud, wire fraud and perjury was placed before the jury. So the jury knew he was a convicted felon. The jury was given about an hour's worth of videotaped testimony from Mr. Falco, who claimed that he was Mr. DeGeorge's right-hand man, that Mr. DeGeorge cooked up all of these claims, that Mr. DeGeorge used cocaine prior to each evaluation session to fake his disabilities, that Mr. DeGeorge read the books on how to be bipolar and how to be organic brain syndrome and also heart problems, and that he faked those. So, and in fact, I did not represent Mr. DeGeorge at the time that Mr. Falco's deposition was taken. And Mr. Falco, who was an insurance company witness, Mr. Falco, when it came time for trial, disappeared, so I couldn't find him. So what happened was the jury and prior counsel barely cross-examined Mr. Falco during the deposition. So in reality, the jury heard one hour of Mr. Falco saying, Mr. DeGeorge is the biggest fraud in the history of the world, and I couldn't cross-examine him. So, look, the insurance company had their shot of telling the jury who Mr. DeGeorge was. There was no secret at that trial who Mr. DeGeorge was, and despite that, the jury found Mr. DeGeorge to be totally disabled because the medical evidence was overwhelming. That was what was critical about it. I have a minute, so let me say something about the bad faith. Here's the thing on the bad faith. The reality, you know, even with Mr. DeGeorge, the reality is the court should have let the prior court, should have let the bad faith come in or be heard before the jury. At the time that the bad faith motion was heard, all the court had were 14 out of 14 doctors saying that Mr. DeGeorge was totally disabled. The insurance company had all of that evidence, four of them being Mr. DeGeorge's physicians. I mean, despite that, four of them being the insurance company's physicians, all saying Mr. DeGeorge was totally disabled. Yet, what happened was, after Mr. DeGeorge, when the insurance company found out about the investigation, they said, we're not going to pay Mr. DeGeorge anymore. It was wrong. It was bad faith. So even though, you know, it's like a grand hope of mine that I'd be able to try the bad faith, you know, I'm not expecting that's going to happen, but I really hope you take the bad faith and really look at that. Let me just last say. Okay. Thank you very much. I appreciate it. Thank you, Mr. Morris. Mr. Weston. Thank you, Your Honor. I don't typically get to make evidentiary objections in the court of appeal, but I do object to Mr. Morris talking about DeGeorge being under care for some disability while in prison. It's not in the record. It was not presented below, and it's not before this Court. But you didn't object to the judge saying that he was under medical care. Yes. Page 2282 to 2283, we did preserve the issue. What did you say exactly? First of all, we attempted to cross-examine Dr. Marmer about when he stopped treating Rex DeGeorge. That was page 1663 to 1665. The district court barred us from cross-examining Dr. Marmer about when he stopped treating DeGeorge for his alleged disability. Then at page 2227, the court makes a ruling that, just going through this chronologically, that the plaintiffs are not permitted to argue DeGeorge was not under the continuous physician's care during the period of time he was incarcerated, and the courts threatened that any such argument would be bad faith. Then at page 2282 to 2283, plaintiffs argued that the jury must find that DeGeorge was under – this is on jury instruction. We asked the court to instruct the jury that they had to find that he was under continuous care of a physician, and the court refused. He says he will not allow plaintiffs to create the inference that DeGeorge was not under the regular care of a physician. So the issue was perfectly preserved, and based on the court's ruling, there was a jury instruction, page 2285, where plaintiffs complied by striking the request that the jury make that finding, and the court, in fact, instructed the jury that he was under the continuous care of a physician, which was – there was no evidence to support that instruction. On the treating physician issue, I just want to point out that this circuit, and in particular, I noticed a couple of Judge Fletcher's opinions dealing with what's called the treating physician rule, and this typically comes up in, like, social security disability claims, where the treating physician rule says that you have – the treating physician – the diagnosis by the treating physician is accorded super weight, great weight, and it can only be overcome by clear and convincing evidence that it's wrong. Well, we've got cases – this is kind of off the point – we've got cases in the ERISA area that say that's not the rule, so I don't know. If you're trying to bring it over into this realm, which is a completely different – I'm saying the rationale for the treating physician rule is that, certainly, the initial diagnoses – and we have evidence in the record, which is cited in the briefs, that subsequent assessing physicians who see George for a short period of time after he's taken cocaine and worn coats and stuff like that are relying on the initial treating physician assessment. Ms. Fletcher, I think you've answered this question, and unless there are others, I think there are not. Thank you for your argument, both of you, and the matter just argued will be submitted. We'll go next to your argument in the liver length matter. Thank you.
judges: B. Fletcher, Rymer, Fisher